ACLI International Incorporated, Respondent, v E.D. & F. Man (Coffee) Limited, Appellant.

Second Department, August 18, 1980

### APPEARANCES OF COUNSEL

*Baker, Nelson & Williams (John P. Dellera, C. Dickerman Williams* and *Clifford Lefebvre* of counsel), for appellant.

*Curtis, Mallet-Prevost, Colt & Mosle (Priscilla Lundin, John E. Sprizzo* and *Herbert Stoller* of counsel), for respondent.

### OPINION OF THE COURT

GIBBONS, J.

This appeal presents the threshold question concerning the sufficiency of such "minimum contacts" of the defendant, a foreign corporation, with the State of New York, under the standards of due process declared by the Supreme Court in *International Shoe Co. v Washington* (326 US 310), *Shaffer v Heitner* (433 US 186), and *Rush v Savchuk* (444 US 320) as would properly warrant the attachment of its assets, unrelated to the subject matter of this action, within this State and, thereby, subject it to jurisdiction quasi in rem of this court; and, second, if such jurisdiction is found to prevail, whether, under the circumstances of this case, the court properly declined to refuse jurisdiction under the doctrine of *forum non conveniens.*

The relevant facts are as follows:

The defendant, E.D. & F. Man (Coffee) Limited (Man), is a corporation, organized under the laws of England with an office in London, where it is engaged in the sale of coffee. On November 15, 1977 it was informed by S.A. Walli, a coffee broker in London, that one of its principals, Globekirk, Ltd., an English corporation, wished to sell documents of title covering approximately 200 metric tons of Ugandan coffee, then on board the S. S. *Mayo Lykes* bound for New Orleans, Louisiana. The documents consisted of two clean on board negotiable bills of lading issued by the owners of the vessel, Lykes Bros. Steamship Co. (Lykes Bros.), described as "Mombasa 27" and "Mombasa 28".

On the same day, after making inquiries, Man learned from another broker, W.F. Westermann & Co. B.V., a Netherlands corporation with offices in Amsterdam, that A.C. Israel Woodhouse Co., Ltd. (ACIW), an English corporation (wholly owned by the plaintiff, ACLI International Incorporated) (ACLI), was willing to purchase the documents. In response, Man advised Walli that it would purchase the documents from Globekirk for the sum of $641,631.78, and on the same day, Man agreed to sell the documents to ACIW through Westermann, acting as broker, for the sum of $658,340.03.

This agreement to sell, as evidenced by the confirmation of sale, provided for arbitration in New York, and that it was pursuant to the "New York FOB Green Coffee Contract" which provided that the rights and remedies of the parties are to be determined under the New York Uniform Commercial Code.

The sale was consummated with the delivery of the documents to Man in London, on or about November 17, 1977, at which time $641,631.78 was paid to Globekirk's agent, and, on the same day, Man negotiated the documents and delivered them to ACIW, together with an invoice requesting payment of the agreed purchase price. The bills of lading were issued in Mombasa by the agent of Lykes and called for delivery of the coffee cargo to the order of the shipper, the Coffee Marketing Board (Uganda) (CMB). The "notify party" named on the documents was Globekirk and both bore what appeared to be the indorsement in blank of CMB.

It appears from the affidavit of a manager of Man that, by arrangement with ACIW, the full purchase price was "actually credited to the Company's account with Bankers Trust Co." in New York City on November 21, 1977.

Thereafter, ACIW transferred the bills of lading by indorsing the same on the reverse sides to the order of the plaintiff, ACLI. The plaintiff is a Delaware corporation authorized to do business in the State of New York, having an office in Westchester County.

When the vessel arrived in New Orleans on November 29, 1977, plaintiff, ACLI, presented its bills of lading and demanded delivery of the coffee. Lykes Bros., however, refused to deliver the coffee and instituted a statutory interpleader action, which is now pending in the United States District Court for the Eastern District of Louisiana. It is alleged in the complaint, *inter alia,* that Lykes was informed, prior to the arrival of the vessel, that the bills of lading held by the plaintiff, ACLI, on which Globekirk was the "notify party", resulted from forged instructions to the carrier and bore the forged indorsements of an officer of CMB, and that the coffee described in the documents had been sold by CMB under bills of lading issued to E.R. Camilleri, a New York resident. CMB, ACLI, Globekirk and E.R. Camilleri were named parties defendant in that action. An attempt by ACLI to bring a third-party action against Man in the Federal court action was dismissed on the ground of lack of jurisdiction.

The plaintiff, as assignee of the documents, then commenced this action and first obtained an order of attachment which resulted in a levy against a bill of lading owned by Man, which is unrelated to this action, and a subsequent levy against certain commodity futures contracts and related funds owned by the defendant and located in New York.

Addressing, first, the question concerning the underlying jurisdiction to support the attachments, it may be noted that Special Term held: "Indeed, in the first challenge to *quasi in rem* jurisdiction to come before the United States Court of Appeals for the Second Circuit after the *Shaffer* decision, a diversity action brought into federal court pursuant to a petition for removal, the Court observed that a party's '[c]onsent to arbitration in New York is a consent to personal jurisdiction of the courts in New York.' *Intermeat, Inc. v. American Poultry Inc.,* 575 F.2d 1017, 1023 (2d Cir. 1978). If such a consent provides a sufficient basis for a court to assert personal jurisdiction over a non resident defendant, then *a fortiori,* it must also provide enough contact for a court to assert that it has jurisdiction over that defendant's property

as well. To the same effect, see *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos,* 553 F. 2d 842 (2d Cir. 1977)."

The court also relied upon the following statement from Weinstein-Korn-Miller (NY Civ Prac, vol 8, par 7501.34, p 75-42): "Under section 1450 of the Civil Practice Act, '[t]he making of a contract or submission for arbitration...providing for arbitration in this state, shall be deemed a consent of the parties theerto *[sic]* to the jurisdiction of the supreme court of this state.' CPLR 301 states 'a court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore.' Thus, any contract, whether or not it is executed in New York, providing for arbitration in New York, is sufficient as a basis for the jurisdiction of the New York courts."

The appellant contends that such rule, insofar as it holds that the presence of a clause in the contract providing for arbitration in New York constitutes a consent to jurisdiction, should be applied strictly to only those situations where recourse to the courts of this State is made under CPLR 7503 to compel or stay arbitration or to determine if such clause is valid. I do not believe that, under the posture of this case, the precise question posed, as suggested by the appellant, concerns the scope of the jurisdiction to be accorded to such clause in the agreement, but, rather, whether, under the circumstances here presented, the presence of such clause may be considered a factor, *among others,* indicating that there existed sufficient "minimal contacts" between the appellant and this State which are such that the maintenance of this quasi in rem proceeding does not offend traditional notions of fair play and substantial justice under the standards of *International Shoe Co. v Washington* (326 US 310, 316, *supra), Shaffer v Heitner* (433 US 186, *supra),* and *Rush v Savchuk* (444 US 320, *supra).*

■ Such reference to arbitration in New York, coupled with such other elements of defendant's contacts with this State to which I shall refer, constitutes the "minimum contacts" necessary to justify the attachment herein.

*Rush v Savchuk (supra,* pp 329-332), strongly supports the conclusion that one method of establishing "minimum contacts" is by showing that there was a reasonable basis for defendant to be aware that because of its engagement in a particular "purposeful activity", it could be required to defend an action relating to that activity in a forum where attachment of its unrelated property is being sought. With industry,

commerce and communications assuming greater world-wide proportions, the concept of the selection by agreement of the parties of the forum of remedy and of the law to be applied in the resolution of disputes has been accepted as a normal aspect of modern business.

Inasmuch as the defendant agreed to arbitration in New York, it must have anticipated and been ready to accept the problems, expense, and inconvenience entailed in having foreign witnesses appear for an arbitration proceeding in New York, and it is illogical for the defendant to now contend that a trial in an action at law is so burdensome as to amount to a denial of due process. In any event, an agreement to arbitrate in New York is an important factor in determining whether there are sufficient "minimum contacts".

The maneuvering of the parties represented an interplay of conflicting interests calculated by each to achieve a specific strategic advantage to itself. The plaintiff, ACLI, appears to be willing to waive and reject the remedy of arbitration, which it bound itself to pursue under the contract, in order to sue at law to gain the benefit of the security of an attachment of Man's assets in this jurisdiction and, thereby, insure recovery should it succeed in this quasi in rem proceeding, while, on the other hand, the defendant, Man, has opted to nurture its own interests in the dispute by likewise foregoing the remedy of arbitration in New York, a right which it has under the contract, in order to be in a position to press its claim that the plaintiff's action is without jurisdiction and to, thereby, compel the plaintiff to sue in England, where it may be in a position to implead Globekirk.

Since, even now, it clearly lies within the defendant's power to stay the instant action, pending arbitration in New York, by the simple device of moving in this very action, pursuant to CPLR 7503 (subd [a]), for such stay under a right it has by virtue of the contract, it may not be said that its link with this State is broken because of the plaintiff's waiver of arbitration by bringing this action. Such right, under the contract, still exists and such nexus with this State continues.

That aspect of the agreement under which the defendant agreed that the New York Uniform Commercial Code would be applied to determine "the rights and remedies of the parties", assumes considerable importance as a significant factor as one of defendant's "contacts" with this jurisdiction,

when considered in the light that such law was to be applied in an arbitration to be held in New York.

With respect to so much of the defendant's contention that the plaintiff's standing to sue on the agreement is based on an apparent artifice of an assignment by ACIW to the plaintiff, a nonrelated New York domiciliary, so that the latter could assert a stronger right to attach defendant's assets in New York, I find from the record the following facts which clearly militate against such conclusion:

The plaintiff, as assignee, is the parent corporation of ACIW, the foreign assignor, and the assignment of the bills of lading to it was consummated before there was any reason to believe that (1) there would be litigation as to the nondelivery of the coffee shipment in New Orleans, and (2) such litigation would require resort to the utilization of a New York domiciliary's motion for an attachment of defendant's nonrelated assets in New York.

Here, both the plaintiff's verified complaint and its supporting affidavits indicate that ACIW assigned to it both its rights under its contract with the defendant and all of its claims that it possessed against defendant Man. There is no showing, at this stage of the proceeding, of any facts to the contrary from which it may be concluded that the plaintiff did not possess such rights.

The order herein, dated September 25, 1979, granting plaintiff's motion to confirm the ex parte supplemental order of attachment, authorized the seizure of additional assets in this State in the form of commodity futures contracts and related funds of the defendant held in trading accounts in this State. Although counsel for the defendant, in his affirmation in opposition, stated that "I am informed by my client that at the time the Supplemental Order of Attachment was served upon the six garnishees, the defendant had no assets in the State of New York", it is to be noted that this statement is not supported by any averment by an officer of the defendant having knowledge, and, further, that the following statement contained in the plaintiff's brief: "Furthermore, the defendant maintained a commodity trading account containing the proceeds of other transactions. This account was the subject of plaintiff's supplemental attachment; the first attachment was against a bill of lading held by a New York bank. While the existence of this property in New York may not be sufficient in and of itself to establish that defendant was transacting

business in New York within the meaning of CPLR 302, it is a significant contact, which when taken in connection with the others mentioned above, clearly establishes a constitutionally sufficient predicate for the exercise of jurisdiction in this case", stands unanswered and unrefuted.

In *Drexel Burnham Lambert v D'Angelo* (453 F Supp 1294, 1298), the court held that the maintenance of a commodity account in this State by a nonresident constituted some evidence of sufficient contact to warrant a holding of jurisdiction. The court held (p 1298): "[B]y maintaining commodities accounts and regularly directing the transaction of business in New York on their behalf, defendants knowingly assumed a predictable risk that they might be compelled to litigate disputes concerning those accounts in New York."

I conclude that in their totality, the several contacts to which I have referred represent the existence of a sufficient minimum nexus between the defendant and New York to satisfy the fairness standard expressed in *International Shoe Co. v Washington* (326 US 310, *supra*), and that such contacts provided a reasonable basis for the defendant to be aware that because of its engagement in this "particular activity", it could be required to defend an action relating to that activity in a forum where attachment of its property unrelated to the lawsuit may be sought *(Rush v Savchuk,* 444 US 320, *supra).*

As mandated by CPLR 6212 (subd [a]), the plaintiff has established by its affidavits and the affidavits and documents submitted by CMB, in the interpleader action pending in the Federal court in Louisiana, that it possesses a cause of action against the defendant, and that it is probable that it will succeed on the merits. Under the present posture of this matter, it appears from an affidavit of the manager of CMB, received in the Federal interpleader action, that its indorsements on the Globekirk bills of lading are forgeries. At this stage, neither the defendant nor any other party in the Federal interpleader action has presented any contrary proof. If it be determined that such indorsements are forgeries, it must follow that the defendant never acquired title to the coffee described in the documents, and that ACIW received nothing of value for the moneys it paid to the defendant to consummate the purchase of the bills of lading. On this record, jurisdiction quasi in rem over the defendant has been established which provides a legal basis for the subject orders of attachment.

I shall now turn to the second question concerning the application of the doctrine of *forum non conveniens.*

In *Silver v Great Amer. Ins. Co.* (29 NY2d 356, 361), the court declared the following criteria to be followed in determining under what circumstances the doctrine of *forum non conveniens* should be invoked: "Its application should turn on considerations of justice, fairness and convenience and not solely on the residence of one of the parties. Although such residence is, of course, an important factor to be considered, *forum non conveniens* relief should be granted when it plainly appears that New York is an inconvenient forum and that another is available which will best serve the ends of justice and the convenience of the parties."

█ Measured against these considerations I am impelled to conclude that the doctrine of *forum non conveniens* should not be invoked for the following reasons:

Although ACLI is a domestic corporation, which constitutes a factor in the resolution of this question, it may be noted also that Lykes Bros. Steamship Co., the carrier which issued the bills of lading, and the Coffee Marketing Board (Uganda), the shipper of the coffee, both have offices in New York. E.R. Camilleri, the party who claimed the coffee under bills of lading issued by the carrier, is also a resident of this State. All are available to the litigants in this jurisdiction for the purpose of obtaining as witnesses such officers, agents or employees who may be conversant with the facts of this case.

In resolving this question considerable weight must be accorded to the choice of the forum and the law to be applied. In *Hadjioannou v Avramides* (40 NY2d 929, 931), the Court of Appeals stated: "Were there substance to plaintiff's contention that there was a valid agreement between the parties to *submit their dispute to arbitration in New York,* such circumstance would have been a relevant consideration, to be weighed with others, in the resolution of the *forum non conveniens* issue" (emphasis added). (See, also, *National Equip. Rental v Aluminum Bldrs. Supply,* 54 AD2d 896.)

Concerning choice of law in a case where the court had jurisdiction by virtue of diversity of citizenship, in invoking the doctrine of *forum non conveniens,* the Supreme Court of the United States in *Gulf Oil Corp. v Gilbert* (330 US 501, 509) stated, with reference to the choice of law by the parties as a persuasive factor in such determination, as follows: "There is an appropriateness, too, in having the trial of a diversity case

in a forum that is at home with *the state law that must govern the case,* rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." (Emphasis added.)

Here, inasmuch as it clearly appears that the defendant, by its agreement, was willing to undertake to resolve any disputes under the agreement by arbitration in New York under the "New York FOB Green Coffee Contract" which provided for application of "the Uniform Commercial Code of New York" (and, significantly, this agreement also specifically provided, "The Uniform Law on the International Sale of Goods shall not apply to this contract"), it is fair to conclude that not only was it not adverse to attending New York to participate in such arbitration, but that it was also willing to accept the burden of bringing its witnesses here, and if such arbitration proceeding were to take place, it must have also assumed the risk that it would not be able to bring Globekirk into that proceeding as a third party.

Special Term properly rejected defendant's contention that jurisdiction should be declined because continuance of this action in New York will create a risk to it of a possible inconsistent determination in an action which it may bring against Globekirk in London. In this regard it must also be noted that ACLI is now involved in this action and the Federal interpleader action now pending in Louisiana, and this argument advanced by the defendant must be considered and evaluated in the light of the fact that for reasons best known to itself, when offered an opportunity to litigate the issues in the Federal action where the specific question concerned the title to the coffee and where ACLI, CMB, E.R. Camilleri, Lykes and Globekirk are named as parties, it declined to do so on jurisdictional grounds.

After balancing all of the above-mentioned factors, it appears, under the circumstances of this case, that New York is not, as contended by the defendant, an inconvenient forum or that an action in London would better serve the ends of justice and the convenience of the parties. Special Term properly exercised its discretion by declining to invoke the doctrine of *forum non conveniens.*

Accordingly, the orders should be affirmed.

HOPKINS, J. P., LAZER and RABIN, JJ., concur.

Two orders of the Supreme Court, Westchester County,

dated July 10, 1979 and September 25, 1979, respectively, affirmed, with one bill of $50 costs and disbursements.